## GENERAL AMERICAN LIFE INS. CO. v. STEPHENS.

### No. 9722.

Circuit Court of Appeals, Ninth Circuit.

June 27, 1941.

John T. Gose, and George B. Gose, both of Los Angeles, Cal., for appellant.

Clyde C. Shoemaker and William J. Currer, Jr., both of Los Angeles, Cal., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

DENMAN, Circuit Judge.

Mercy Brown Stephens, as beneficiary of a life insurance policy issued to Louis Stephens, brought suit in the district court against the General American Life Insurance Company to recover the death benefits. General American answered alleging that the policy was void at the time of the insured's death for three reasons: (1) forfeiture of the policy for failure to keep the cash value of the policy above the total of loans and interest advanced against the policy; and (2) lapse of the policy for failure to pay the annual premium for the policy year in which the

insured died. The insurer claimed that certain unpaid cash coupons payable to the insured at the date of payment of the premiums were not applicable to premium payment. It further contended (3) that if the coupons were so applicable there had been a lien created on them which prevented so using them. Failure to make the premium payment in question was not controverted but the district court found the insurer had in its hands money which should have been applied to the satisfaction of the premium and that such payment would have raised the cash value of the policy so as to prevent forfeiture. As a result the policy was held to have been in good standing at the time of the insured's death and judgment was entered for the beneficiary in the amount of $9,942.34. The insurer appeals on the ground that the court erred in finding it had in its hands money which should have been applied to the satisfaction of the premium.

The insurance contract was a 20-year life policy for $10,000 with the premiums payable annually and was non-participating during the premium paying period. Three provisions of the policy are pertinent to this case. The first is that for the advancement of premiums from the loan value provisions of the policy by a "charge" of "such premium against this policy." It provides: "If an application for the Automatic Premium Loan privilege, signed by the Insured, either as a part of the application for this policy, or as a separate request, is received at the Home Office of the Company before default in the payment of any premium, then if any premium due after the third policy year shall not be paid at the expiration of the period of grace, the Company will charge such premium against this policy as a loan in accordance with the provision of the 'Cash Loans' clause of the policy, provided the then available loan value shall be sufficient to enable such advance, or if insufficient, the Company will so charge a semi-annual or quarterly premium against the policy but not less than a quarterly premium, and interest on all indebtedness to the date on which the next such premium shall become due; if, at any time, however, the available loan value shall be less than the amount of any such advance required, then the amount of the available loan value shall be applied to the purchase of extended insurance in accordance with the 'Automatic Extended Insurance' provision of the policy."

Application for the Automatic Premium Loan Privilege in accordance with the above provision was made by the insured as a part of his application for the policy.

The second provision with which we are concerned is that extending to the insured the right to cash loans on the "sole security" of the policy. It contains the following clause: "Whenever the amount of the total indebtedness (cash loans plus interest) equal the cash surrender value, the policy shall become void one month (not less than thirty days) after the Company shall have mailed notice to the last known address of the Insured and of the assignee of record, if any."

The third pertinent provision is attached to the policy as a rider, entitled "New Triple Option—Guaranteed Premium Reductions," the provisions of which are set out in the footnote below. [1]

---

[1] "This policy is issued on the New Triple Guaranteed Premium Reduction plan, and in the use of the coupons, the Insured may select one of the three following options:

"Option 1. The Insured may use the amounts designated in the coupons hereto attached for the reduction of his premium payments from year to year.

"Option 2. The Insured may elect to pay all premiums without reduction, in which case the Company guarantees that, after payment of premiums in full for 16 years and surrender of this policy duly discharged and all attached coupons to the Company, a policy paid-up for life for the face amount hereof, granting excess interest dividends, will be issued. If the available cash value and coupon accumulation is in excess of the net single premium for such paid-up insurance according to the American Experience Table of Mortality and interest at the rate of three and one-half per cent per annum, such excess shall be paid in cash to the Insured.

"Option 3. The Insured may elect to pay all premiums without reductions, in which case the Company guarantees that this policy shall mature as an endowment after paying the premiums in full for 18 years; and, upon surrender of this policy duly discharged and all attached coupons on the first anniversary of this policy after such payments are completed, the face amount of the policy less any indebtedness to the Company, will be paid in cash. If the available cash value and coupon

Attached to the rider were 19 coupons, each of which, except for the amounts and the dates of maturity, was in the following form:

"On or at
any time after    Mar. 20, 1927        $120.60
International
Life Insurance Co.
St. Louis, Mo.

Will pay to the order of the Insured under Policy No. 156284 (or to the order of the assignee if said policy is assigned) ........ 120.60........Dollars Subject to conditions of said policy, provided all premiums due on said policy up to and including said date have been paid.

Payable At Its Home Office   R. Paisley,
No. 2                         President."

Each coupon contained a maturity date which corresponded exactly with the date when an annual premium on the policy became due.

The insured paid the premium annually from the date of issuance of the policy until nine annual premiums had been paid, which maintained the policy in full force and effect up to the tenth policy year beginning March 20, 1934. The coupons attached to the policy were allowed to accumulate until during the ninth policy year (which commenced March 20, 1933) eight coupons had matured. During April of that year, the coupons which had ma-

tured were presented to Missouri State Life Insurance Company for cash payment but that company made the excuse of an insurance moratorium and refused cash payment.[2] In response to a renewed demand of July 7, 1933, insured was paid cash for coupon No. 1. Coupons Nos. 2–8 were never paid.

On August 28, 1933, Missouri State Life Insurance Company was declared insolvent and on September 7, 1933, assets of the insolvent company were sold to General American Life Insurance Company, herein referred to as the Insurer.

A "Certificate of Assumption" showing that the insurer had assumed the policies of Missouri State Life Insurance Company was sent the insured by the insurer. The certificate recited that pursuant to the "Purchase Agreement" there existed a lien against the insured's policy of $1,054. The provision of the "Purchase Agreement" out of which the claimed lien arose is set forth in the footnote below.[3]

On January 19, 1933, the insured executed a policy loan agreement to secure cash advances of $3,050 against the policy. By the loan agreement the policy was assigned to the insurer as its "security" and annual interest was made payable in advance. Since at this time coupons Nos. 1–8 were due and unused and, according to the provisions of the "Premium Reduc-

accumulation is in excess of the face amount of the policy, such excess shall be paid in cash to the Insured.

"In case the Insured shall pay all premiums in full, without coupon reduction, the unused due coupons shall be placed to the credit of the policy and shall be payable at any time, together with compound interest at the rate of three and one-half per cent per annum for each full year after due dates thereof; or, in the event of the death of the Insured said amount shall be payable to the beneficiary in addition to the face amount of the policy.

"Accumulated value of coupons, at the end of 5th Yr. $533.30, 10th Yr. $1401.-40, 15th Yr. $2,532.20, 20th Yr. $3,975.-10."

[2] The policy was originally issued by International Life Insurance Company but it was reinsured by the Missouri State Life Insurance Company three years after issuance.

[3] "Section (c) Liens.—Inasmuch as the present appraised value of the assets purchased hereunder is less than the required

reserves, a lien (adjusted to the nearest dollar) equal to 50% of the terminal reserve on each policy of life insurance and each annuity policy as such reserve has been established in the accounts of the Old Company, computed as of September 1, 1933, to the date to which premiums on such policies have been paid, will be established and placed against such policy; provided, that in no case shall such lien exceed the amount by which said reserve shall be in excess of the indebtedness on any such policy as of September 1, 1933. Such lien shall bear interest at the rate of five per cent (5%) per annum from September 1, 1933, until September 1, 1948, and thereafter at the rate of four per cent (4%) per annum, such interest to be paid on each policy anniversary date, and if not so paid, to be compounded annually; and said lien and interest shall be treated otherwise in all respects and with like effect as policy loan indebtedness under the terms of such policy. Such lien and its accumulation shall be carried as an asset by the New Company with like effect and in like manner as policy loans. * * *."

tion Plan" set out supra, were "to the credit of the policy," the insurer after the assignment held both the policy and the credits to the policy as security for the loan.

The sums thus loaned to the insured equalled the full cash and loan value of the policy for the ninth premium year. The ninth premium year ended March 20, 1934, and on that date the insurer sent to the insured the following notice of forfeiture of policy:

"Notice of Forfeiture.

"Interest is due as indicated on the reverse side of this notice and payment should be made to the collection office designated hereon.

"Your policy contains a clause providing that failure to repay any loan on the policy or to pay interest thereon, shall not avoid the policy unless the total indebtedness to the Company shall equal or exceed the cash value of the policy, nor until one month after notice shall have been mailed to you to the address last known by the Company.

"Inasmuch as the amount of the outstanding indebtedness on your policy equals the present available cash value the policy has lapsed and will be void in accordance with its terms, unless the interest thereon is paid within the period stated in the preceding paragraph."

The interest payment demanded was in the amount of $183. The tenth annual premium of $936 became due on the same date. The sum of $1,054 was by this time due insured on matured and accumulated coupons Nos. 2–8. The insured died seven months later, October 22, 1934, without having made payment of either the demanded interest payment or the tenth annual premium.

The district court found that the matured accumulated and unused coupons were not subject to the lien of the purchase agreement and were available for the payment of the annual premium due on March 20, 1934; that the insurer was obligated so to apply the value of the coupons in order to prevent a forfeiture of the policy; that if coupon sums had been so applied to the payment of the premium the cash and loan value of the policy would have been increased from $3,050 to $3,450, according to the "Table of Guaranteed Values" contained in the policy, an amount in excess of the total indebtedness on the policy of March 20, 1934. The court therefore held that the policy was not properly forfeited for failure to keep the cash value of the policy above the indebtedness on the policy and that it did not lapse for failure to make the tenth premium payment.

■ I. In support of the judgment of the district court, the beneficiary relies upon the doctrine broadly stated in many cases "that an insurer is not justified in declaring a forfeiture of an insurance policy for the nonpayment of a premium when, at the time such premium accrues, the insurer is indebted to the assured, either for dividends declared or other funds which it may have in its hands belonging to the policy holder." American Nat. Ins. Co. v. Yee Lim Shee, 9 Cir., 104 F.2d 688, 693, 694. It is not necessary to decide whether this doctrine should be applied to the present case in view of the assignment of the policy with its coupon credit as security for the repayment of the loan.

■ After providing certain options may be exercised by the insured in the use of the matured coupons, the "Guaranteed Premium Reduction Plan" provides: "In case the Insured shall pay all [4] premiums in full, without coupon reduction, the unused due coupons shall be placed to the credit of the policy and shall be payable at any time, together with compound interest at the rate of three and one-half per cent per annum for each full year after dates thereof * * *." (Emphasis supplied.)

The significant fact here is that the credit is to the "policy" and not to the insured. Ordinarily money loaned on a policy of life insurance does not constitute a personal obligation and the loan is payable only out of any proceeds at

---

4 That this provision is not restricted in its application by the word "all" to the situation where the premiums have been paid for the whole period of 20 years is apparent when compared with another provision below: "If all premiums on this policy shall have been paid in full, without coupon reductions, *to the end of* **TWENTY** *years,* * * * the Insured may have the choice of one of the three following options, * * *." (Emphasis supplied).

The boldface words would be unnecessary if by the word "all" in the clause first cited was meant the whole premium paying period.

maturity.[5] Here security, the assignment of the policy with its coupon credits, is given for payment of the loan, indicating that the insured as borrower intends the coupon credit to the policy shall be exhausted in discharge of the loan and the policy kept alive.

■ At the time of the expiration of the 31-day grace period on the tenth annual premium, the cash loan value had been exhausted. The value of the then due and unused coupons which were "to the credit of the policy" amounted to $1,054. Applying this security of $1,054 to the loan of $3,050, which just equalled the cash surrender value of the policy, plus the interest of $183, left the cash surrender value a credit to the policy of $871. Since in the insured's application he had exercised his option to have this applied pro tanto to his premium due of $936, it procured an extension of the policy for a period beyond the seven months later when insured died.[6]

II. The insurer contends, however, that the coupon credits were not free so to be used because under the purchase agreement it has a lien on the coupon reserve.

The beneficiary contends that the insurer has not proved that it had established in the accounts of the insurer any coupon reserve and that in any event the phrase "terminal reserve" of such a coupon life policy does not include an amount for the policy's coupon liabilities.

The pertinent portion of the clause creating the claimed lien is: "* * * a lien * * * equal to 50% of the terminal reserve on each policy of life insurance * * * *as such reserve has been established in the accounts of the Old Company, computed as of September 1, 1933, * * *.*" (Emphasis supplied.)

The terminal reserve of the policy is the reserve to meet its increasing obligations at the termination of its annual accounting period. It is claimed by the insurer that the terminal reserve of the insured's life policy "as established in the accounts of the Old Company" (Missouri State Life) includes an item of reserve to pay the coupons, upon which the assumption contract creates a lien.

We have seen that until paid these coupons are "credited to" the *policy* by its express terms. They are integral parts of the entire insurance contract. In making the contract for the assumption of the liability of the Old Company on its outstanding policies, it is obvious that the insurance commissioner and the insurer would be as much concerned with the reserves to meet the coupons credited to the policy as to those to meet the credit of its cash surrender value.

The district court decided that the reserve of the policy did not include its coupon liability because required to make an interpretation adverse to the insurer of two of the phrases of the lien provision above quoted of the assumption contract. These are the phrase "accounts of the Old Company" and the phrase "terminal reserve."

■ The court construed the contract between the insurance commissioner and the assuming company against the latter as if it were a policy issued to the insured. With this we cannot concur for two reasons.

In the first place the contract is not one shown to be drawn by the insurer without participation on behalf of the insured. We may properly assume that the insurance commissioner and the assuming company dealt at arms' length in framing the contract terms, including the lien provisions. Hence the rule as to interpretation of ambiguities against the insurer does not apply.

■ In the second place the rule of construction against the insurer is not one of *after wisdom* to be applied in each case to bring a verdict for the insured. It is a rule to be applied *looking forward from the making of the insurance contract* with reference to the benefit of *all* the insured in the class for which that form of contract exists. For example, take the policy here with its coupon provisions. Assume two insured

---

[5] Board of Assessors of Orleans Parish v. New York Life Ins. Co., 216 U.S. 517, 30 S.Ct. 385, 54 L.Ed. 597; Williams v. Union Central Life Ins. Co., 291 U.S. 170, 54 S.Ct. 348, 78 L.Ed. 711, 92 A.L.R. 693; Wagner v. Thieriot, 203 App. Div. 757, 197 N.Y.S. 560, affirmed 236 N.Y. 588, 142 N.E. 295; Manufacturers' Trust Co. v. Equitable Life Assur. Soc., 244 App.Div. 357, 361, 279 N.Y.S. 457.

[6] The "Automatic Premium Loan privilege" provision states that if the amount of the available loan value of the policy is insufficient to pay a whole premium, "the Company will so charge a semi-annual or quarterly premium against the policy but not less than a quarterly premium, and interest on all indebtedness to the date on which the next such premium shall become due * * *."

persons have borrowed nothing on their policies and hence have not assigned their policies with the effect above indicated, and that they have not exercised their option to have premiums charged against the loan value of the policy. Both are dissatisfied with the insurer and stop paying premiums. Both have unpaid coupons. One comes, two years later, and demands their payment and, on refusal by the insurer on the ground they have been applied to the unpaid premiums, sues the company. The other insured dies within a period to which the policy would be extended if the coupons were construed as automatically applying to the unpaid premiums. The company claims they were not so applicable and that it still owes on the coupons. His widow is denied payment of the policy principal and sues, claiming the unpaid coupons ceased to be payable in cash as soon as the insured ceased paying his premiums and became automatically applied to the premiums to keep the policy alive. It is obvious that the application of an after wisdom rule requiring that the two identical policies must be construed in opposite ways to bring about a recovery on each, produces a result which is a logical absurdity.

█ So with regard to the contract between the insurer and the insurance commissioner. Looking forward, it cannot be said that it may not be to the best interest of *all* the policy holders that a lien should exist on the reserve including the coupons. It may well be that the payment of the principal on all the policies, including that of the insured here, would be a far greater certainty with the lien than without. In this connection it must be remembered that the insurance commissioner represented *all* the policy holders in making the contract.

We believe that the contract should be interpreted under the ordinary rules of construction, and that the appraisal of evidence of experts concerning the meaning of its phrases, and the admissibility of evidence pertinent to its provisions, should not have been controlled by any rule of interpretation adverse to the insurer.

The insurer offered the record of the company of the liability portion of the semi-annual statement of liabilities of the company for June 30, 1933. It was prepared in a form prescribed for a report to the Missouri insurance commissioner. Such accounting is required by the Missouri law to be filed with the commissioner. The company also offered the testimony of the

company's actuary in charge of the statement and of the company's accounts that its analysis would show that the terminal reserves for life insurance contracts containing such coupon agreements included the coupon liabilities.

It was also shown that life insurance companies generally prepare their accountings in similar form. There was also introduced in evidence the individual policy card of the insured, he being one of the 250,000 persons having policies accounted for in this annual accounting. The card showed no reserves at all for ordinary life insurance, much less for a life insurance contract with the instant coupon agreements. Testimony also was offered that this accounting to be reported to the insurance commissioner was computed directly from these cards and that there was no reserve computed in the accounts of the company, except as it is set up in the annual or semi-annual statements.

The court refused to admit the document showing the accounting and the testimony showing that a coupon reserve was computed therein, because the accounting was made for the purpose of a report to the insurance commissioner. It held, in effect, that the words "as such reserve has been established in the accounts of the Old Company" might mean accounts required by law for reports to the insurance commissioner and other accounts of the company. Because in this case the account prepared for the official report tended to sustain a contention favorable to the insurer, the word "accounts" must be interpreted as accounts other than for such reports. Since the individual cards showed no reserve at all, the court held there was none to which a lien could attach.

█ In applying such a rule we believe the court erred. It would seem that if the accounting for the report had been against the insurer's interest, such after wisdom concerning the effect of the contract on the claim for the subsequent death of the insured would make it admissible. The proferred evidence should have been accepted.

The court also applies the same rule of interpretation, adverse to the insurer, to the phrase "terminal reserve on each policy" as modified by the phrase "as such reserve has been established in the accounts." The court construed this narrowly to mean that any reserve for coupons was "outside the terminal reserve for the company's policies."

There was conflicting expert testimony as to whether this was the interpretation customarily given to the phrase in the insurance world. It is so interpreted by the Supreme Court in Helvering v. Inter-Mountain Life Ins. Co., 294 U.S. 686, 689, 55 S. Ct. 572, 79 L.Ed. 1227. There coupon reserves were not allowed as life policy reserve deductions provided by an income tax statute, because deduction provisions in such statutes are construed against the taxpayer,—that is, he must clearly show that his claimed deduction is within the statute.

We believe the court erred in applying such a narrow rule of interpretation to the conflicting evidence of the experts given on this phrase of the contract between the insurer and the commissioner. In our opinion whatever the phrase "terminal reserve on each policy" may mean when standing alone, it here includes any amount for coupon liability which is shown to have been established by computation on the company's accounts as a reserve for that purpose.

The case is reversed for a new trial in which this rejected evidence shall be received.

Reversed.